UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF PENNSYLVANIA

NORMAN N. SHELTON,  :
                    :
        Plaintiff   :  No. 3:CV-12-0422
                    :
    vs.             :  (Judge Nealon)
                    :
C/O T. CRAWLEY, et al.,  :
                    :
        Defendants  :

FILED
SCRANTON

APR 4 2013

PER _M. S. L_
DEPUTY CLERK

## MEMORANDUM

On March 7, 2012, Norman N. Shelton, an inmate confined in the United States

Penitentiary, Lewisburg ("USP-Lewisburg"), Pennsylvania, filed the above captioned Bivens,[1]

action. Named as Defendants are D. Young, Associate Warden; R. Miller, Lieutenant; J. Seeba,

Lieutenant; L. Hunter, Lieutenant; D. Brewer, Unit Manager; G. Shuck, Counselor; S. Argueta,

Correctional Officer; A. Cotterall, Case Manager; R. Hamilton, Correctional Officer; T. Crawley,

Correctional Officer; H. Miosi (Ladisic), Registered Nurse; T. Liesenfield, Correctional Officer; D.

Rogers, Correctional Officer; R. Grenot, Correctional Officer; M. Edinger, Counselor; Psychologist

Mink and Psychologist Howson. Shelton raises numerous claims of excessive use of force, threats,

falsifying incident reports, interference with access to the courts, destruction of personal property,

interference with incoming legal mail, and planting contraband in his cell. (Doc. 1, complaint). He

alleges that these were acts of retaliation for his complaining about alleged excessive use of force

and were meant to prevent him from completing the Special Management Unit ("SMU") program

and transferring out of his current cell block. Id. For relief, Shelton seeks a preliminary and

permanent injunction ordering Defendants to cease their alleged acts of violence and retaliation and

---

[1]Bivens v. Six Unknown Agents of the Federal Bureau of Narcotics, 403 U.S. 388,
397 (1971).

further ordering the BOP to transfer Shelton to another institution. Id. Additionally, he seeks compensatory and punitive monetary damages. Id.

Presently before the Court is Defendants' motion to dismiss or, in the alternative, for summary judgment (Doc. 66), Plaintiff's motions for declaratory relief, preliminary injunctions and temporary restraining orders (Docs. 20, 24, 34, 39, 43, 46, 49, 51, 59, 93, 95, 98, 115), Plaintiff's motion for reconsideration of this Court's July 19, 2012 Order denying Plaintiff's motion for appointment of counsel (Doc. 45), Plaintiff's motions for default judgment (Docs. 53, 56, 62, 88), Plaintiff's motion for contempt (Doc. 78), and Plaintiff's motions for summary judgment, writ of mandamus and to expand the record (Docs. 99, 103, 109). For the reasons set forth below the Court will grant Defendants' motion to dismiss and for summary judgment, and dismiss, or deny Plaintiff's remaining motions.

I. **Summary Judgment**

A. **Bivens Standard**

Plaintiff's claims are filed pursuant to 28 U.S.C. § 1331, in accordance with Bivens v. Six Unknown Named Agents of the Fed. Bureau of Narcotics, 403 U.S. 388, (1971). Under Bivens, the District Court has federal question jurisdiction pursuant to 28 U.S.C. § 1331 to entertain an action brought to redress alleged federal constitutional or statutory violations by a federal actor. Id. Pursuant to Bivens, "a citizen suffering a compensable injury to a constitutionally protected interest could invoke the general federal question jurisdiction of the district court to obtain an award of monetary damages against the responsible federal official." Butz v. Economou, 438 U.S. 478, 504 (1978). A Bivens-style civil rights claim is the federal equivalent of an action brought pursuant to

42 U.S.C. § 1983 and the same legal principles have been held to apply. See Paton v. LaPrade, 524 F.2d 862, 871 (3d Cir. 1975); Veteto v. Miller, 829 F.Supp. 1486, 1492 (M.D. Pa. 1992); Young v. Keohane, 809 F. Supp. 1185, 1200 n.16 (M.D. Pa. 1992). In order to state an actionable Bivens claim, a plaintiff must allege that a person has deprived him of a federal right, and that the person who caused the deprivation acted under color of federal law . See West v. Atkins, 487 U.S. 42, 48 (1988); Young v. Keohane, 809 F.Supp. 1185, 1199 (M.D. Pa. 1992); Sharpe v. Costello, 2007 WL 1098964, *3 (M.D. Pa. 2007).

## B. Summary Judgment

Through summary adjudication the court may dispose of those claims that do not present a "genuine issue as to any material fact" and for which a jury trial would be an empty and unnecessary formality. See FED. R. CIV. P. 56(c). The burden of proof is upon the non-moving party to come forth with "affirmative evidence, beyond the allegations of the pleadings," in support of its right to relief. Pappas v. City of Lebanon, 331 F. Supp. 2d 311, 315 (M.D. Pa. 2004); FED. R. CIV. P. 56(e); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322–23 (1986). This evidence must be adequate, as a matter of law, to sustain a judgment in favor of the non-moving party on the claims. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250–57 (1986); Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587–89 (1986); see also FED. R. CIV. P. 56(c), (e). Only if this threshold is met may the cause of action proceed. Pappas, 331 F. Supp. 2d at 315.

The pertinent portions of the Middle District of Pennsylvania Local Rules of Court, which are set forth in the Standing Practice Order served upon Plaintiff on March 7, 2012, (Doc. 3), provide that, in addition to filing a brief in response to the moving party's brief in support, "[t]he

papers opposing a motion for summary judgment shall include a separate, short and concise statement of material facts responding to the numbered paragraphs set forth in the statement [of material facts filed by the moving party] ..., as to which it is contended that there exists a genuine issue to be tried." See M.D. Pa. LR 56. 1. The Rule further states that the statement of material facts required to be served by the moving party will be deemed to be admitted unless controverted by the statement required to be served by the opposing party. See id. Though Plaintiff has managed to clutter this docket with various miscellaneous motions, as well as two briefs in opposition to Defendants' pending motion, he has neither submitted a counter statement of facts, nor requested an enlargement of time within which to do so. Thus, he has failed to controvert the material facts contained in Defendants' statement. As such, the Court will deem Defendants' statement of material facts as admitted.

### C. **Statement of Facts**

Shelton is currently serving a 322-month term of imprisonment for bank robbery and related charges, with a projected release date of January 21, 2017. See (Doc. 74-1, Ex. A-1, BOP SENTRY Report, Public Information Inmate Data).

Shelton has been assigned to USP-Lewisburg since August 27, 2009, to participate in the SMU program. (Doc. 74-1, Ex. A-2, Inmate History).

Prior to his assignment to the SMU program, Shelton had an extensive discipline history, including interfering with security devices, threatening another with harm, assault with serious injury, making sexual proposals, and fighting. See (Doc. 74-1, Ex. A-3, Inmate Discipline Data). Since his assignment to the SMU program, Shelton's disciplinary history includes assault with

serious injury, threatening bodily harm, assault without serious injury, making sexual proposal/threatening, insolence toward staff and fighting. Id. Because Shelton's behavior, while assigned to the SMU program, continues to be disruptive, he has been placed in restraints on several occasions. See (Doc. 74-1, Ex. A-4, Incident Search).

On April 2, 2011, Officer Grenot reported to the third floor of B-Block to retrieve razors that were passed out earlier to inmates for showers. (Doc. 74-5, Ex. B, Declaration of R. Grenot at ¶ 3, Ex. B-1, Incident Report). She unlocked the wicket (whole in the door through which inmates' hands are restrained, food trays are passed and other items can be given to or taken from inmates) and asked Shelton to return his shaving razor. Id. Shelton threw a razor at her hitting her in the upper right leg. Id. Officer Grenot then wrote an incident report against Shelton for assaulting any person, in violation of Code 224, and refusing to obey an order, in violation of Code 307. Id.

On July 15, 2011, a Disciplinary Hearing Officer ("DHO") hearing was held, the charge of assault without serious injury was upheld, and Shelton received sanctions, including 27 days loss of good conduct time ("GCT") credit toward his federal sentence. See (Doc. 74-1, Ex. A-3, Inmate Discipline Data).

On August 13, 2011, Shelton displayed imminent violence while being escorted from the shower area back to his assigned cell by making verbal threats toward staff. (Doc. 74-1, Ex. A-5, Form 583 Report of Incident). Due to his disruptive behavior and display of imminent violence, the Warden was notified and authorized the assembly of a Use of Force Team to place Shelton in ambulatory restraints.[2] Id. The Use of Force Team included the following Defendants: G. Shuck

---

[2]Pursuant to BOP Program Statement No. 5566.06:

(continued...)

(the Confrontational Avoidance Member of the team), Nurse Miosi (the Medical team member), R. Grenot (one of the camera operators), and R. Miller (Use of Force Lieutenant). Id. Confrontation avoidance measures were successful and Shelton submitted to being placed in ambulatory restraints. Id.

While in restraints on that date, Nurse Miosi performed two medical checks on Shelton: at 9:50am, when she noted that Shelton was standing and his circulation was adequate; and at 10:00am, when she noted that Shelton was sitting and his circulation was adequate. (Doc. 74-5, Ex. C-1, Health Services Restraint Review Form). Shelton remained in restraints approximately 48 hours, until 10:00am on August 15, 2011. (Doc. 74-1, Ex. A-6, Fifteen Minute Restraints Check Form). Shelton's general welfare was checked every 15 minutes throughout the time he was in ambulatory restraints. Id. In addition, Shelton's general welfare was checked every two hours by a lieutenant. See (Doc. 74-5, Ex. D-1, Two Hour Lieutenant Restraints Check Form). Lieutenant Seeba was one of the lieutenants who performed these checks. Id. Lieutenant Seeba noted during his 10:00 am check on August 13, 2011, that Shelton stated, "leave me alone . . . cracker" and

---

[2](...continued)
1. The Bureau of Prisons authorizes staff to use force only as a last alternative after all other reasonable efforts to resolve a situation have failed. When authorized, staff must use only that amount of force necessary to gain control of the inmate, to protect and ensure the safety of inmates, staff and others, to prevent serious property damage, and to ensure institution security and good order. Staff are authorized to apply physical restraints necessary to gain control of an inmate who appears to be dangerous because the inmate:
     a. Assaults another individual;
     b. Destroys government property;
     c. Attempts suicide;
     d. Inflicts injury upon self; or
     e. Becomes violent or displays signs of imminent violence.
The policy also instructs that once an inmate is placed in restraints, the restraints should remain on the inmate until he regains self-control. Id.

noted that Shelton was not calm and was to remain in restraints. Id. Lieutenant Seeba noted during another check of Shelton at 12:00pm on August 13, 2011, that Shelton told him to leave him alone and that he would see him in court; and that Shelton was not calm and was to remain in restraints. Id. Lieutenant Seeba also conducted checks of Shelton at 6:00pm and 8:00pm on August 13, 2011. Id. Lieutenant Seeba noted that Shelton had not regained control, and during one of the checks, Shelton stated, "get the fuck out of here bitch." Id. On both occasions Lieutenant Seeba noted that Shelton should remain in restraints. Id.

On August 15, 2011, at 10:00am, Lieutenant Flemming, who is not a Defendant in this case, noted that Shelton had regained self-control and that he was released from restraints. Id. Other medical staff performed ten other medical checks upon Shelton while he was in restraints. See (Doc. 74-5, Ex. C-1, Health Services Restraint Review Form). Officials conducted an After Action Review following the August 13, 2011, incident. See (Doc. 74-2, Ex. A-7, After Action Review Report). None of the participants in the review are Defendants in this case. See id. The Review concluded that the actions taken by staff with respect to the use of force were "reasonable and appropriate." Id.

Officials drafted Incident Report No. 2197852 against Shelton because of his conduct on August 13, 2011, charging him with threatening bodily harm, in violation of Code 203. (Doc. 74-1, Ex. A-3, Inmate Discipline Data).

The DHO provided Shelton with a hearing on August 18, 2011. Id. The DHO found that Shelton committed the prohibited conduct and imposed sanctions against him including the loss of 27 days GCT. Id.

On March 7, 2012, Shelton filed the above captioned action, alleging the following allegations against each named Defendant:

### 1.    Allegations against Officer Crawley

Shelton alleges that "on August 13, 2011, Correctional Officer Crawley escorted Plaintiff Shelton and his cellmate Louis Griffin to the shower on I-Block" and "Crawley placed Shelton's handcuffs on so tight that it cut off [his] blood circulation." (Doc. 1, Complaint at ¶ 1). When Plaintiff complained about the handcuffs being tight, Crawley stated "you keep talking and you won't get no show[er] today, nigga." Id. Shelton claims he "did not say anything else and was placed in the shower" and "upon entering it Crowley pushed Plaintiff in his back, making Plaintiff's face hit the back of the shower." Id.

Shelton further alleges that Officer Crawley laughed after Shelton told Officer Biddle, who is not named as a defendant, that he wanted to see the lieutenant to report being assaulted by Officer Crawley, and Officer Biddle stated, "I didn't see it so it didn't happen and if you know what's good for you, you know it didn't happen. You get my meaning?" Id. at ¶ 2.

Shelton alleges that after he and his cellmate showered, Officer Crawley stated, "I got that nigga Shelton." Id. at ¶ 3. He then walked up to Plaintiff and told him to "cuff up". Id. Plaintiff "turned around and was cuffed up", and then Crowley "smashed down real hard on the handcuffs" causing Plaintiff to yell out 'what is your dame (sic) problem." Id. Crawley then "t[oo]k his time opening up the shower door" to cause Shelton suffering. Id.

Shelton further alleges that when they arrived at his cell, Officer Crawley stated "you are not so smart, filing grievances on staff members here, we are all family, you don't' want to go up

against the family" and that when Plaintiff responded by asking to see the lieutenant, Officer Crawley falsely accused Plaintiff of threatening him. Id. at ¶ 4.

Shelton alleges that the assault team was also standing in front of his cell when he returned from his shower. Id. at ¶ 5. Plaintiff's counselor asked Shelton "are you going to be disruptive, or are you going to be nice and cuff up." Id. Plaintiff placed his hand and wrist threw the tray slot to be cuffed up, and "once the assault team placed handcuffs upon [him] "so tight he yelled out what's all that for," Officer Crawley stated, "I told you you didn't want me to call the Lt." Id at ¶ 6.

Finally, Shelton alleges that Officer Crawley and Counselor Shuck refused to give Shelton his incoming legal mail and threatened him with bodily harm, stating that Associate Warden Young "gave us all the green light to do what we want to you if you don't drop the class action suit." Id. at ¶ 17.

### 2.  **Allegations against Lieutenant Miller**

Shelton alleges that during the above incident, Lieutenant Miller was holding the camera and laughing as "the assault team," i.e., a planned use of force team, stood in front of his cell. Id. at ¶ 5. He claims that on that same day,[3] Lieutenants Hunter, Miller, Seeba, and Officer Hamilton all threatened him if he continued to file lawsuits, and when he asked "are you telling me that all of you have plotted and conspired to keep me here after my (30) months," they answered, "yes" and told him that Associate Warden Young "gave us the green light on you," and that two disciplinary hearing officers would take 27 days every time he came before of them. See id. at ¶ 13.

---

[3]Shelton listed the date in this paragraph as August 13, 2012; however, this appears to be an error, as elsewhere in the Complaint, this date is listed as August 13, 2011.

### 3. **Allegations against Officer Grenot**

Shelton alleges that Officer Grenot was holding the camera during this time and laughing as "the assault team" stood in front of his cell. See id. at ¶ 5. He further alleges that Officer Grenot ordered him to remove his clothing in front of the block and proceeded to laugh. See id. at ¶ 6.

Shelton further alleges that after unnamed staff applied the hand cuffs too tightly, Officer Grenot and Nurse Miosi called him a "poor baby," and Officer Grenot further stated, "the only time Shelton is strong is when he have a pen in his hand." See id.

Shelton alleges that on or about April 18, 2011, when Officer Grenot removed his handcuffs, they cut into his wrists, causing him to bleed, she told him he "you shouldn't have moved in that would not have happen to you." See id. at ¶ 12.

Finally, he alleges that Officer Grenot falsified an incident report alleging that he threw a razor at her, and then "had the assault team come and take [him] to D-Block." See id.

### 4. **Allegations against Counselor Shuck**

Shelton alleges that while the assault team was outside of his cell, Counselor Shuck asked him if he was going to be disruptive or "be nice and cuff up." See id. at ¶ 5. Shelton alleges that Officer Crawley and Counselor Shuck refused to give Shelton his incoming legal mail and threatened him with bodily harm, stating that Associate Warden Young "gave us all the green light to do what we want to you if you don't drop the class action suit." Id. at ¶ 17.

### 5. **Allegations against Nurse Miosi (Ladisic)**

Shelton alleges that after unnamed staff applied the handcuffs too tightly, Nurse Miosi stated, "look, his hands are turning blue. That got to be hurting," and when he yelled to Lieutenant

Miller that the restraints were too tight, Nurse Miosi and Officer Grenot called him a "poor baby." See id.

He further claims that Nurse Miosi and Lieutenant Seeba called him a "little piece of shit." Id. at ¶ 7.

### 6. Allegations against Lieutenant Seeba

Shelton alleges that Lieutenant Seeba and Nurse Miosi called him a "little piece of shit," then Lieutenant Seeba called him "a cold hearted bitch" and stated that she didn't like him "filing paper work on me and my co-work[ers]." See id. at ¶¶ 7, 8.

Plaintiff further alleges that Lieutenant Seeba then spit in his face and punched him on the left side of his head. Id.

Finally, Shelton alleges that on August 13, 2012, Lieutenants Hunter, Miller, Seeba and Officer Hamilton all threatened him if he continued to file lawsuits, and when he asked "are you telling me that all of you have plotted and conspired to keep me here after my (30) months," they answered, "yes" and told him that Associate Warden Young "gave us the green light on you," and that two disciplinary hearing officers would take 27 days every time he came before of them. See id. at ¶ 13.

### 7. Allegations against Associate Warden Young

Shelton alleges that two days later, he told Associate Warden Young that Nurse Miosi refused to medically assess his wounds and spit in his face, and Associate Warden Young replied that she would deny it and "who am I to believe, you or her?" Id. ¶ 9. He further claims that when he told Associate Warden Young that Lieutenant Seeba punched him, he replied, "you have so

many enemies here you did it to yourself stop your hand from picking up your pen and you might just make it out of here." See id. Shelton alleges that when he then asked Associate Warden Young if that was a threat, he replied, "I never liked you and I see why everyone tell me to keep you here. You know what Shelton? That's just what I am willing to do." See id.

### 8. Allegations against Unit Manager Brewer

Shelton states that "once unit Manager Brewer mad his rounds and stopped at Plaintiff Shelton's cell door, Plaintiff Shelton asked Brewer about his completion of his 30 months in the SMU and where will they be transferring him." Id. at ¶ 10. Unit Manager Brewer stated "you wont' be leaving, we decided to keep you here." Id. When Shelton protested, Brewer told him to "file on it and walked away." Id.

### 9. Allegations against Psychologist Mink

Shelton alleges that Psychologist Mink threatened him with bodily harm, falsified an incident report alleging that he spit in her face and threatened to kill her, and kicked him in the leg. See id. at ¶ 11.

### 10. Allegations against Lieutenant Hunter and Officer Hamilton

Shelton alleges that on August 13, 2012, Lieutenants Hunter, Miller, Seeba, and Officer Hamilton all came to Plaintiff's cell and threatened him if he continued to file lawsuits, and when he asked "are you telling me that all of you have plotted and conspired to keep me here after my (30) months," they answered, "yes" and told him that Associate Warden Young "gave us the green light on you," and that two disciplinary hearing officers would take 27 days from him every time he came before them. See id. at ¶ 13.

### 11. Allegations against Counselor Edinger

Shelton alleges that on May 15, 2011, Counselor Edinger refused to give him postage stamps and threatened to "hurt you bad" if Shelton continued filing lawsuits. See id. at ¶ 14.

### 12. Allegations against Officer Rogers

Shelton alleges that Officer Rogers "committed the prohibited act of searching Plaintiff's cell" and "destroying [his] family pictures, legal mail from district courts and Plaintiff's lawyers" and "leaving cell in disarray." Id. at ¶ 15. Rogers then "pulled Plaintiff out of the cell search and escorted Plaintiff to the showers." Id. Rogers "looked around in back at Plaintiff" and then "punched [him[ in the face, pushed him in the shower" and told him "that from A.W. Young and me," and threatened if he did not stop filing lawsuits or drop out of a class action suit. Id. at ¶ 15.

### 13. Allegations against Psychologist Howson

Shelton alleges that on January 2, 2012, or January 5, 2012, Psychologist Howson threatened to file false incident reports against him and told him Associate Warden Young did not like what he was doing, then spit on his hand through the tray slot in his cell door. See id. at ¶ 16.

### 14. Allegations against Officer Argueta

Shelton alleges that on February 13, 2012, Officer Argueta found two "lock-picking devices" in his cell, and when Shelton asked him where they came from, he told Shelton that Associate Warden Young wanted him to "drop the case" or he would remain in the SMU program. See id. at ¶18.

### 15. Allegations against Officer Cotterall

Shelton alleges that Case Manager Cotterall spit in his face when he asked for a copy of a document. See id.

**16.    Allegations against Officer Liesenfield.**

Despite amending his Complaint to add Officer Liesenfield, see (Doc. 17), Shelton offers no allegations against Officer Liesenfield in the Complaint or his motion to amend.

**17.    Facts regarding exhaustion**

The BOP has an administrative remedy procedure with respect to inmate complaints, namely 28 C.F.R. § 542.10. The purpose of the Administrative Remedy Program is to allow an inmate to seek formal review of an issue relating to any aspect of his/her own confinement. See 28 C.F.R. § 542.10(a). If an inmate raises an issue in a request or appeal that cannot be resolved through the Administrative Remedy Program, the BOP will refer the inmate to the appropriate statutorily-mandated procedures. See id. § 542.10(c). Inmates are to informally present their complaints to the staff and staff are to attempt to resolve the matter. See id. § 542.13(a). If the informal resolution is unsuccessful, the inmate is then to execute the appropriate form to bring the matter to the attention of the warden. See id. The warden then responds to the inmate's complaint within 20 calendar days. See id. § 542.18.

If an inmate is dissatisfied with the warden's response, he may then appeal to the Regional Director within 20 calendar days. See id. § 542.15(a). If the response of the Regional Director is not satisfactory, the inmate may then appeal to the BOP's Central Office within 30 calendar days, which office is the final administrative appeal in the BOP. See id. An exception is made for appeals of Discipline Hearing Officer (DHO) decisions, which are first raised directly to the

regional office level and then to the central office level. See id. § 542.14(d)(2). No administrative remedy appeal is considered to have been fully exhausted until rejected by the BOP's Central Office. See id. § 542.

On November 23, 2012, a search of Plaintiff's records was conducted to determine whether Shelton had exhausted available administrative remedies regarding the issues raised in the Complaint. See (Doc. 74-1, Ex. A, Declaration of Michael Romano, BOP Attorney Advisor for USP-Lewisburg at ¶ 16). Shelton's administrative remedy history is very voluminous. Id. A general search of his administrative remedies frustrated the SENTRY data base producing more results than could be viewed. Id. Therefore, the parameters were narrowed to the relevant time period, from April 1, 2011, through November 22, 2012, for administrative remedies filed at the national level. Id. Forty-seven (47) of Shelton's administrative remedies were filed at the national level. (Doc. 74-1, Ex. A-8, Administrative SENTRY record from April 1, 2011 through November 22, 2012). Of the forty-seven (47) administrative remedies filed by Shelton during the pertinent time frame, the record before the Court reveals that Shelton has only properly exhausted the administrative remedy process with respect to two (2) Administrative Remedies: (1) Plaintiff's administrative appeal regarding the August 18, 2011 disciplinary action against him for the August 13, 2011 incident[4], and (2) Plaintiff's administrative remedy regarding allegations that Officer

_____

[4]The Court notes that Defendants mischaracterize this claim as "that Officer Crawley applied Shelton's restraints too tight on August 13, 2011." See (Doc. 74, Statement of Material Facts). A review of Plaintiff's appeal reveals that there is no reference to Crawley applying restraints. In fact, Defendants statement of material facts indicate that the Warden authorized a Use of Force Team to subdue Plaintiff and place him in ambulatory restraints on August 13, 2011. Id. Defendant Crawley is not listed as a member of the Use of Force Team. Id.

Rogers wrongly destroyed his legal papers while searching his cell.[5] Id.

Plaintiff filed Administrative Remedy No. 658117, appealing the August 18, 2011 disciplinary action against him related to the August 13, 2011 incident report he received, charging him with threatening bodily harm, in violation of Code 203. (Doc. 72-4, Ex. A-8 at 18). In his September 18, 2011 appeal, Shelton challenges the circumstances for the incident report, the use of restraints, and their impact, complains that he was not allowed a phone call while in restriction, the DHO could not show that he signed a document because he was in restraints for two days which injured his hands such that he could not hold a pen, he did not have an opportunity to prepare for the hearing, the incident report was fabricated as an act of retaliation, and Officer Crawley lied. (Doc. 74-2, Ex. A-10, Administrative packet for Remedy No. 658117).

On October 21, 2011, Plaintiff's appeal was denied by the Regional Director, based on the following:

> You appeal the August 18, 2011, decision of the Discipline Hearing Officer (DHO) at USP-Lewisburg, finding you committed the prohibited act of Threatening, Code 203, Incident Report No., 2197852. You state there was no threat of bodily harm. You request the incident report be expunged.
>
> The DHO determined you committed the prohibited act based upon the following: On August 13, 2011, while escorting you to your cell you stated, "come on boy take me in the back so we can do this I am gonna kick your ass, come on let's do this, let's go cone on I am ready to go. Take me to the back so we can do this." The DHO considered the evidence presented and reasonably found the greater weight of the evidence supported you committed the offense.

---

[5]Although Plaintiff filed two opposition briefs, he fails to address Defendants' exhaustion argument in either, nor does he submit any evidence demonstrating that he exhausted any other claims. See (Docs. 83, 84, briefs in opposition).

Threatening to kick another person's ass is a threat of bodily harm. All threats must be taken seriously in a correctional environment as staff do not have the luxury to wait and see if an inmate follows through with their threat.

The record in this case reflects substantial compliance with Program Statement 5270.09, Inmate Discipline. The decision of the DHO was based upon the greater weight of the evidence and the sanctions imposed were consistent with the severity level of the prohibited act. The sanctions imposed, 30 days disciplinary segregation, 4 months loss of telephone and visiting privileges and disallow 27 days good conduct time were not disproportionate to your misconduct. Accordingly, your appeal is denied.

If you are dissatisfied with this response, you may appeal to the General Counsel, Federal Bureau of Prisons. Your appeal must be received in the Administrative Remedy Section, Office of General Counsel, Federal Bureau of Prisons, 320 First Street, N.W., Washington, D.C. 20534, within 30 calendar days of the date of this response.

Id. On November 21, 2011, Plaintiff filed a Central Office Administrative Remedy Appeal, stating

the following:

I am dissatisfied with the regional decision for infraction #2197852. D.H.O. Jordan committed a due process violation towards plaintiff by not allowing plaintiff a phone call even under a restriction. C.F.R. clearly states that an inmate under any restriction a prisoner is allowed one (1) phone call once a month. D.H.O. Jordan never read plaintiff a memorandum or could show plaintiff signature on it? Plaintiff objected to the proceeding of the hearing because plaintiff was in restraint for two and ½ days with the restraints so tight that they cut off plaintiff's blood circulation and plaintiff's hands were deformed from the swelling and no feeling nor could plaintiff hold a pen. Plaintiff did not have the opportunity to prepare for the hearing nor could plaintiff. Crowley wrote the fabricated incident report on 8-13-11 out of retaliation for filing grievances on him and other staff. A communication of an effectual or intended threat must be and the intention to injury an another on their property by some unlawful act which do not even exist in the report. The Black law dictionary defines a threat as the declaration of intents to cause harm. There were no physical intention stated or existed. In speaking word is not mentally unsettled by such language in this type of environment no harm come to the officer at no time. He just lied. Plaintiff be compensated for the pain and injuries caused by Crawley should be fired at once.

Id.

On May 29, 2012, Plaintiff's administrative remedy was denied by the Central Office, based

on the following:

> This is in response to your Central Office Administrative Remedy in which you
> appeal the DHO's hearing decision on August 18, 2011, for Threatening Another
> with Bodily Harm, Code 203. You claim you did not commit the prohibited act.
>
> Our review of your disciplinary proceedings indicates substantial compliance with
> P.S. 5270.08, Inmate Discipline and Special Housing Units. The DHO's decision
> was based upon the greater weight of the evidence detailed in Section V of the DHO
> report. The DHO gave greater weight of the evidence to the description of your
> behavior as provided by the reporting officer. We find it reasonable for the DHO to
> have made this determination based on a review of the evidence to include your
> verbal testimony as well as the handwritten statements you submitted for review to
> the DHO which are documented in the disciplinary record. Although you dispute
> the charge, the evidence is sufficient to support the finding.
>
> Based on our review, we find that the required disciplinary procedures were
> substantially followed; the greater weight of the evidence supports the decision, and
> the sanctions imposed were appropriate for the offense. Your appeal is denied.

Id.

On November 8, 2011, after attempting to resolve the matter informally, Plaintiff filed

Request for Administrative Remedy No. 665041. (Doc. 74-1, Ex. A-11, Administrative Packet for

Remedy No. 665041). Shelton stated that he "disliked the response to informal resolution attempt

of October 20, 2011, where upon C/O Rogers committed the prohibited criminal act of taking and

throwing away Plaintiff Norman Shelton's legal document." Id. Plaintiff further states that

Plaintiff's "documents were in his cell before defendant C/O Rogers searched plaintiff's cell with

Officer Hess and Packer" and "upon entering back into his cell plaintiff notice that his legal

envelope that contained all his documents from the Courts were missing." Id. Plaintiff claims that

he then "called C/O Hess to the door and ask to see the trash bag so he could het his legal

documents back" and "C/O Hess stated no, we are not given (sic) anything back that we took" and

"if C/O Rogers looked at your paperwork as being trash and threw it away, that's something you will have to take up with him." Id.

On November 22, 2011, Warden Bledsoe responded with the following:

This is in response to your Request for Administrative Remedy received November 17, 2011, wherein you state staff confiscated legal material from you during a shakedown. As relief, you request to be compensated for your loss and a staff member be fired.

An inquiry was conducted into this allegation to include interviews with applicable staff members and a review of relevant documentation. All staff interviewed denied confiscating any of your legal materials. Program Statement 5521.05, Searches of Housing Units, Inmates, and Inmate Work Areas, states staff may search an inmate's housing and work area, and personal items contained within those areas, without notice to or prior approval from the inmate and without the inmate's presence.

In view of the above, your request for Administrative Remedy is denied.

If you are dissatisfied with this response, you may appeal to the Regional Director, United States Federal Bureau of Prisons, Northeast Regional Office, United States Customs House – Seventh Floor, Second and Chestnut Streets, Philadelphia, PA 19106, within twenty (20) calendar days from the date of this response.

Id. On December 5, 2011, Plaintiff filed an appeal to the Regional Director, who denied his appeal, stating the following:

You appeal the response from the Warden at USP-Lewisburg regarding your allegation that a staff member improperly confiscated your legal paperwork. You claim after your cell was searched and you returned, your legal documents were gone. You are requesting that you be compensated and the staff member terminated.

A review of your appeal revealed the Warden adequately addressed your complaint and advised that a review was conducted. There is no indication any legal paperwork was confiscated and you fail to submit evidence to substantiate this claim. If you are alleging loss to your personal property allegedly caused by Bureau staff negligence, you may consider filing a separate claim under the Federal Tort Claims Act or 31 U.S.C. § 3723, whichever applies, to the Regional Counsel. Accordingly, your appeal is denied.

> If you are dissatisfied with this response, you may appeal to the General Counsel, Federal Bureau of Prisons. Your appeal must be received in the Administrative Remedy Section, Office of General Counsel, Federal Bureau of Prisons, 320 First Street, N.W. Washington, D.C. 20534, within 30 calendar days of the date of this response.

Id.   Plaintiff filed an appeal to the BOP Central officer, and, although a response from the BOP Central Office to this remedy was due on April 6 2012, it did not issue until October 2, 2012; therefore, Defendants concede that Shelton fully exhausted this claim. (Doc. 74-1, Ex. A, Romano Decl. at ¶ 18).

The forty-five (45) remaining administrative remedies, filed by Shelton, during the relevant time period, were either unrelated to the allegations in the complaint, see (Doc. 74-2, Ex. A-12 through A-26), or were rejected for procedural reasons. See (Doc. 74-2, Ex. A-8, SENTRY Report).

## III.   **Discussion**

### A.   **Exhaustion**

The Prison Litigation Reform Act ("PLRA") requires prisoners to present their claims through an administrative grievance process before seeking redress in federal court. The act specifically provides as follows:

> No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted.

42 U.S.C. § 1997e(a). Under the PLRA, a prisoner must exhaust all available administrative remedies before raising claims under § 1983 concerning prison conditions. See id. This "exhaustion requirement applies to all inmate suits about prison life, whether they involve general

circumstances or particular episodes, and whether they allege excessive force or some other wrong." Porter v. Nussle, 534 U.S. 516, 532 (2002). "[I]t is beyond the power ... of any ... [court] to excuse compliance with the exhaustion requirement, whether on the ground of futility, inadequacy or any other basis." Nyhuis v. Reno, 204 F.3d 65, 73 (3d Cir. 2000), quoting Beeson v. Fishkill Corr. Facility, 28 F. Supp. 2d 884, 894–95 (S.D.N.Y. 1998) (citing Weinberger v. Salfi, 422 U.S. 749, 766 (1975)). The PLRA "completely precludes a futility exception to its mandatory exhaustion requirement." Nyhuis, 204 F.3d at 71.

The PLRA also mandates that inmates "properly" exhaust administrative remedies before filing suit in federal court. Woodford v. Ngo, 548 U.S. 81, 92 (2006). See also Oriakhi v. United States, 165 Fed. Appx. 991, 993 (3d Cir. 2006), quoting Johnson v. Jones, 340 F.3d 624, 627 (8th Cir. 2003) ("[T]he district court must look to the time of filing, not the time the district court is rendering its decision, to determine if exhaustion has occurred.").

"Proper exhaustion demands compliance with an agency's deadlines and other critical procedural rules ...." Id. at 90–91. Such requirements "eliminate unwarranted federal-court interference with the administration of prisons, and thus seek[ ] to 'affor[d] corrections officials time and opportunity to address complaints internally before allowing the initiation of a federal case.'" Id. at 93 (quoting Porter, 534 U.S. at 525)). Failure to comply with procedural requirements of the applicable prison's grievance system will result in a procedural default of the claim. Spruill v. Gillis, 372 F.3d 218, 227–32 (3d Cir. 2004) ("[P]rison grievance procedures supply the yardstick for measuring procedural default.") A procedural default, "either through late or improper filings, bars the prisoner from bringing a claim in federal court unless equitable

considerations warrant review of the claim." Gallego v. United States, Civil No. 1:02–CV–1157, 2005 WL 1653166, *2 (M.D. Pa. July 8, 2005).

The uncontroverted record in the instant case reveals that Shelton failed to exhaust administrative remedies with regard to all but two of his claims: his challenge to his August 18, 2011 disciplinary proceedings[6] and his claim that Officer Rogers wrongly destroyed his legal papers while searching his cell. See (Doc. 74-1, Ex. A-8, Administrative SENTRY record from April 1, 2011 through November 22, 2012). Thus, the Court will dismiss all but these two claims for failure to exhaust administrative remedies.

## B.    Claims Based on Disciplinary Proceedings

The sanctions levied against Shelton were all imposed as a result of prison misconduct. As such, the Court finds that any Fourteenth Amendment claim regarding his disciplinary hearing is barred under Heck v. Humphrey, 512 U.S. 477 (1994) and Edwards v. Balisok, 520 U.S. 641 (1997).[7]    Under some circumstances, a prisoner may bring a Bivens claim for monetary damages

---

[6]Although Plaintiff exhausted his due process claims regarding the August 18, 2011 disciplinary hearing, addressing Plaintiff's August 13, 2011 incident report, he failed to exhaust his Eighth Amendment excessive force claim arising out of the August 13, 2011 incident. While Plaintiff mentions in his appeal that he was "in restraints for two and ½ days with the restraints on so tight that they cut off plaintiff's blood circulation", Plaintiff makes no mention in his administrative appeal of any of the named Defendants having applied the restraints. The only Defendant named in his appeal is Correctional Officer Crawley, who Plaintiff claims "fabricated the incident report." (Doc. 74-2, Ex. A-10 at 48). In Spruill, the Third Circuit Court of Appeals held that an inmate procedurally defaulted a claim by failing to identify the defendant in his grievance. Spruill at 234. Therefore, as it relates to any of the named Defendants actually involved in applying the ambulatory restraints, Plaintiff failed to exhaust his Eighth Amendment excessive force claim.

[7]While Heck, and Balisok all involved § 1983 cases, courts have extended their holdings to Bivens actions. See Lora-Pena v. F.B.I., 529 F.3d 503, 506 n.2 (3d Cir. 2008)

(continued...)

based on the denial of due process during a prison disciplinary hearing. See Wolff v. McDonnell, 418 U.S. 539, 554 (1974) (stating that plaintiff's § 1983 "damages claim was ... properly before the District Court and required determination of the validity of the procedures employed for imposing sanctions, including loss of good time, for flagrant or serious misconduct"). However, such due process claims cannot be brought in a Bivens action where the claims "necessarily imply the invalidity of the punishment imposed" unless the plaintiff shows that the sanctions have been overturned. See Balisok[8], 520 U.S. at 648 (finding claims for declaratory and monetary relief based on allegations that plaintiff was denied opportunity to present a defense and that hearing officer was biased could not be brought pursuant to § 1983); Heck, 512 U .S. at 486-87 ("We hold that, in order to recover damages for allegedly unconstitutional conviction or imprisonment, or for other harm caused by actions whose unlawfulness would render a conviction or sentence invalid, a § 1983 plaintiff must prove that the conviction or sentence has been reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such determination, or called into question by a federal court's issuance of a writ of habeas corpus, 28 U.S.C. § 2254.").

---

[7](...continued)
("Although Heck involved a § 1983 action by a state prisoner, the reasoning in Heck has been applied to bar Bivens claims" (citing Williams v. Hill, 74 F.3d 1339, 1341 (D.C. Cir. 1996) (per curiam)).

[8]In Edwards v. Balisok, the Supreme Court applied the lessons of Heck to a state prisoner action, seeking compensatory and punitive damages, challenging the constitutionality of procedures used in a prison disciplinary proceeding that resulted in the loss of good-time credits, but not necessarily challenging the result and not seeking the restoration of the good-time credits. Again, the Court emphasized that such a claim is not cognizable under § 1983 if a favorable outcome would necessarily imply the invalidity of the challenged judgment, there the disciplinary finding and punishment. 520 U.S. at 646-8.

Similarly, claims that disciplinary proceedings were filed in retaliation for a prisoner's exercise of his First Amendment rights are barred where the prisoner's success on such claims would "necessarily imply the invalidity of the deprivation of his good-time credits." See Balisok, 520 U.S. at 646, 648; cf. Muhammad v. Close, 540 U.S. 749, 754-55 (2004) (finding retaliation claim not barred by Heck because challenged disciplinary proceeding did not affect duration of sentence). But see Woods v. Smith, 60 F.3d 1161, 1164-66 (5th Cir. 1995) (rejecting argument that prisoner could not bring § 1983 retaliation action "unless he first establishes that the underlying disciplinary proceedings were terminated in his favor")[9], cert. denied, Palermo v. Woods, 516 U.S. 1084 (1996).

In this case, Shelton claims that Defendants unlawfully authorized, assembled, and utilized a use of force team to place him in ambulatory restraints. However, the Disciplinary Hearing Officer found Shelton guilty of threatening bodily harm, and imposed sanctions on him for this violation. (Doc. 74, SMF ¶¶ 64–68). In making his findings and imposing discipline, the DHO considered and rejected Shelton's version of the incident, which Shelton attempts to repeat in this lawsuit. Thus, were Shelton to prevail on his claims that authorizing and using a use of force team to place him in ambulatory restraints on August 13, 2011, was unlawful, he would necessarily implicate and call into question the validity of the DHO's finding that Shelton was guilty of the very violation that caused Defendants to seek permission to utilize a use of force team, and that caused

---

[9]The plaintiff in Woods challenged a disciplinary proceeding that did not affect the duration of his sentence. See Woods, 60 F.3d at 1163 (noting that after disciplinary hearing, plaintiff "was sentenced to four weeks loss of canteen, ten days isolation, and a change in quarters").

the Warden to authorize its use with respect to Shelton. Heck and Edwards make clear that such claims are impermissible.[10] Because these claims are plainly barred by Heck and Edwards, the Court will dismiss Shelton's claims against Defendants for authorizing a use of force team to place him in ambulatory restraints.

### C. Access to Courts Claim

In this case, Plaintiff's second exhausted claim alleges that Defendant, Corrections Officer Rogers "committed the prohibited criminal act of searching Plaintiff's cell, destroying Plaintiff Shelton's family pictures, legal mail from district courts and from Plaintiff's lawyers, leaving Plaintiff's cell in disarray." (Doc. 1, complaint). Plaintiff, however, fails to allege an actual injury as he does not identify any legal matter that was obstructed or negatively impacted due to the alleged destruction of the mail at issue. There is simply no indication that Plaintiff suffered an actual injury in that he lost a chance to pursue a nonfrivolous claim because of Defendant's conduct. See Gibson v. Superintendent of N.J. Dep't of Law & Public Safety–Div. of State Police, 411 F.3d 427, 444–45 (3d Cir. 2005) (dismissing denial of access claim for failure to specify causes of action lost).

In Bounds v. Smith, 430 U.S. 817 (1977), the United States Supreme Court held that "the fundamental constitutional right of access to the courts requires prison authorities to assist inmates

---

[10]Although the claim is unexhausted, this rationale would equally apply to Plaintiff's claim regarding the July 15, 2011 disciplinary proceedings, where Plaintiff was found guilty of assault without serious injury, and sanctioned 27 days loss of good conduct time, for an April 2, 2011 incident where Shelton threw a razor at Officer Grenot, hitting her in the upper right leg. See (Doc. 74-1, Att. 1, Ex. A-3, Inmate Discipline Data).

in the preparation and filing of meaningful legal papers by providing prisoners with adequate law libraries or adequate assistance from persons trained in the law." Id. at 828. To establish a denial of access to the courts, a plaintiff must show that he was denied "meaningful" access to the courts. Id. at 823. It is not enough to show that a law library does not meet some minimum requirements suggested by some entity or that it does not contain certain titles or volumes. Instead, an inmate must show an actual injury in order to have the requisite standing to challenge the adequacy of a prison law library. Lewis v. Casey, 518 U.S. 343, 349-55 (1996). The plaintiff must allege specific instances of prejudice to his legal rights, such as the dismissal of an action for failure to satisfy some technical requirement about which the prisoner could not have known because of deficiencies in the prison's legal assistance facilities, or the inability to present to the courts an arguably actionable harm because of inadequacies in the prison law library. Id. at 351. As explained in Oliver v. Fauver, 118 F.3d 175, 177-78 (3d Cir. 1997):

> [A]fter Casey, even claims involving so-called central aspects of the right to court access require a showing of actual injury. That is, the inmate must "demonstrate that the alleged shortcomings hindered his efforts to pursue a legal claim."

In the instant case, Shelton has failed to allege any specific instance in which he sustained some actual injury. He has not alleged that he has missed some deadline, was precluded from making some arguably meritorious argument or motion, or was otherwise injured because of the purported destruction of legal materials. In fact, Shelton's ability to present this current action indicates that his access to the courts has not been impeded. Accordingly, Plaintiff's access to courts claim will be dismissed and it appears that granting Plaintiff leave to amend this claim would be futile.

### D. **Preliminary Injunction and Temporary Restraining Order**

Preliminary injunctive relief is extraordinary in nature and should issue in only limited circumstances. See American Tel. and Tel. Co. V. Winback and Conserve Program, Inc., 42 F.3d 1421, 1426-27 (3d Cir. 1994), cert. denied, 514 US. 1103 (1995). Moreover, issuance of such relief is at the discretion of the trial judge. Orson, Inc. v. Miramax Film, Corp., 836 F. Supp. 309, 311 (E.D. Pa. 1993). In determining whether to grant a motion seeking preliminary injunctive relief, courts in the Third Circuit consider the following four factors:

(1)    likelihood of success on the merits;
(2)    irreparable harm resulting from a denial of relief;
(3)    the harm to the non-moving party if relief is granted; and
(4)    the public interest.

United States v. Bell, 2003 WL 102610, *2 (M.D. Pa. January 10, 2003) (Conner, J.) (internal citations omitted). It is the moving party that bears the burden of satisfying these factors. Id. The standards for a temporary restraining order are the same as those for a preliminary injunction. Bieros v. Nicola, 857 F. Supp. 445, 446 (E.D. Pa. 1994).

Perhaps the most important prerequisite for the issuance of a preliminary injunction is a demonstration that if it is not granted, the applicant is likely to suffer irreparable harm before a decision on the merits can be rendered. See Continental Group, Inc. v. Amoco Chems. Corp., 614 F.2d 351, 356 (3d Cir. 1980). Irreparable injury is "potential harm which cannot be redressed by a legal or equitable remedy following a trial ." Instant Air Freight, 882 F.2d at 801. A court may not grant preliminary injunctive relief unless "[t]he preliminary injunction [is] the only way of protecting the plaintiff from harm." Id. The relevant inquiry is whether the party moving for the injunctive relief is in danger of suffering the irreparable harm at the time the preliminary injunctive

relief is to be issued. Id. Speculative injury does not constitute a showing of irreparable harm. Continental, 614 F.2d at 359; see also Public Serv. Co. v. West Newbury, 835 F.2d 380, 383 (1st Cir. 1987). "The possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation, weighs heavily against a claim of irreparable harm." Instant Air Freight, 882 F.2d at 801 (quoting Sampson v. Murray, 415 U.S. 61, 90 (1964)). Of course, a prisoner lacks standing to seek injunctive relief if he is no longer subject to the alleged conditions he attempts to challenge. See Weaver v. Wilcox, 650 F. 2d 22, 27 n.13 (3d Cir. 1981) (prisoner's transfer from the prison moots claim for injunctive and declaratory relief with respect to prison conditions, but not claims for damages.)

Based on Plaintiff's failure to prevail on the merits of the exhausted claims within the instant civil rights action, Plaintiff's motions for preliminary injunction and temporary restraining orders, in which Plaintiff repeatedly requests to be transferred from his current housing unit to Z Block and have the Court arrest and/or lodge criminal charges against the Defendants, (Docs. 20, 24, 34, 39, 43, 46, 49, 51, 59, 93, 95, 98, 115), will be denied.

A separate Order will be issued.


Dated: April 4, 2013

**United States District Judge**